# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

CHARLES MARTIN,                    :

     Petitioner,                :        Case No. 3:08cv00338

 vs.                               :        District Judge Timothy S. Black
                              Magistrate Judge Sharon L. Ovington

WARDEN, North Central Correctional  :
Institution,[1]

                        :

     Respondent.               :

                        :

---

# REPORT AND RECOMMENDATIONS[2]

---

## I. <u>Introduction</u>

At the conclusion of Petitioner Charles Martin's trial in state court, the jury found him guilty of committing a slew of criminal offenses including, but not limited to, murdering Jeannette Jackson; attempting to murder Jackson's sister Anitra; four counts of rape, each including the specification that Martin was a sexually violent predator (based on trial judge's findings); and aggravated robbery. Today, Martin is in state custody serving a life sentence plus fifty-five years.

---

[1]  Martin was transferred to the North Central Correctional Institution (NCCI) at some point after he filed the present case. Consequently, the proper Respondent at present is Ed Shelton, Warden of NCCI.

[2]  Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

Martin has exhausted all his potential remedies in the Ohio courts.  He now turns to this Court seeking a writ of habeas corpus under 28 U.S.C. §2254, asserting that his convictions and sentence violate his rights under various provisions of the United States Constitution.

The case is before the Court upon Martin's pro se Petition for Writ of Habeas Corpus (Doc. #1), Respondent's Return of Writ (Doc. #5), Martin's Traverse (Doc. #8), and the record as a whole.

## II.  <u>Background</u>

The Ohio Court of Appeals partly described the events leading to Martin's convictions as follows:

> On April 25, 2000, Jeanette Jackson and her sister, Anitra Jackson, left at approximately 11:30 p.m. to go to a club.  On the way, they dropped off their children, Jeanette's one-year-old son Carlos and Anitra's three-year-old son Allister with Defendant-Appellant Charles Martin to babysit.  Martin is also Carlos' father.  However, Martin and Jeanette evidently were no longer involved in a relationship.  At around 2:30 a.m., Anitra and Jeanette left the club together, followed by Marcus, the bartender from the club.  They dropped off a friend at her home and proceeded to Anitra's house....  Jeanette and Marcus then left together.  Anitra went to sleep in her bedroom.

> At about 3:15 a.m., Martin called Anitra and asked where Jeanette was, complaining that his six-year-old son Dominic was having an asthma attack.  Anitra informed him that she did not know Jeanette's whereabouts.  She hung up the phone and went back to sleep.  The next thing Anitra remembered was Jeanette jumping on her bed exclaiming, "he's got a gun."  Immediately thereafter, Martin walked into the room holding a gun.

> Upon entering the bedroom, Martin stated that "he had time to think about how he was going to do it," that he was going to kill them.  Martin told them that, because they liked to be together so much, they were going to die

2

together. Then he yanked the phone out of the wall and threw the cordless phone into the toilet. Martin explained that he was upset about them laughing at him and about Jeanette being with Marcus, among other things. At this time, he began dumping out purses, yanking off their jewelry, and going through dresser drawers. Martin told the women he was going to make it look like a robbery. After finding no money in Anitra's purse, Martin rummaged through her dresser drawers and found $240, which he put in his pocket.

During this process, Martin attempted to pull two rings off Jeanette's fingers and became upset when they would not come off. Anitra then jumped out of bed, ran to the doorway, and told him "he was going to do what he was going to do." Martin said to Anitra, "You know what, Jackson? I never did like you." He then shot her in the chest. Even after being shot, Anitra lunged at Martin and wrestled with him in an attempt to grab the gun. Jeanette tried to break them up. After the struggle, Anitra fell to the floor, and Jeanette applied pressure to Anitra's gunshot wound with a shirt to stop the bleeding.

* * *

[Facts concerning the rapes Martin committed are omitted]

After a while, Anitra told Martin she had to use the restroom. He finally allowed her to go. As she entered the restroom, which was attached to the bedroom, she saw Martin grab a blue pillow and throw Jeanette on the bed. While she was in the bathroom, Anitra overheard Jeanette begging him not to "do it." She stated, "Don't do this. What about the kids?" In response to this question, Martin told Jeanette that he was going to shoot Carlos in the head. Soon after, Anitra pushed open the window and climbed out, running out onto Salem Avenue screaming for help. The time was approximately 6:00 a.m.

As Anitra was running across Salem Avenue, she attempted to enter a van, but the van drove away. At that moment, she saw Martin behind her, firing the gun. He yelled, "you must die, bitch." One shot penetrated her back, and she fell to the ground. As this happened, two vehicles came to a stop in the southbound lanes of Salem Avenue. These two motorists witnessed what transpired next.

According to Anitra, Martin fired two shots while she lay on the ground, one penetrating her hand and the other her shoulder. When he tried to fire a third time, the gun jammed. Both witnesses testified that Martin had fired the gun once while she was on the ground and that the gun jammed the second time. Mr. Davis, the witness in the right lane, testified that Martin had

cleared the gun to fire a third time and that the gun had jammed again.  At that point, Martin ran off, heading northbound back up Salem Avenue.  Ms. Muhammed, the witness in the left lane, testified that she had been screaming when Martin fired at Anitra the first time and had continued to scream the whole time he was in front of her car.  Ms. Muhammed claimed that, while she was screaming, Martin had looked at her and raised the gun, but that the gun had jammed.  He then ran off.

After Martin ran away, Ms. Muhammed backed up and drove around Anitra to a gas station on Salem to get the police.  Mr. Davis, on the other hand, while watching Martin run away, heard a knock on his driver's side window.  He turned to see Anitra standing there.  Mr. Davis unlocked his door and allowed Anitra to climb into his truck.  They drove to the police station while he held onto the door with his hand because it would not close with Anitra sitting to his left.

Once they arrived at the police station, Mr. Davis flagged down some officers to tend to Anitra.  She told the officers that Martin had shot her and that her sister was being held hostage at her residence.  Anitra was then taken to the hospital.

In the meantime, Ms. Muhammed also arrived at the police station, and both Mr. Davis and Ms. Muhammed were questioned by police.  When shown a photospread containing Martin's picture, Mr. Davis picked out two potential suspects, neither of which were Martin.  Ms. Muhammed, on the other hand, picked Martin out of the spread.  She also testified at trial that she would never forget his face.

When the police arrived at Anitra's residence, they found Jeanette's body lying partially on the bed, with her lower body hanging off.  She had a pillow over her face with a hole in it.  Jeanette had been shot through the pillow into her right temple.  The bullet had then exited behind her left ear, and gone through the bed and the floor.  It was recovered inside the furnace in the basement.  An officer testified that there had still been signs of life when they first discovered Jeanette, but she died shortly thereafter.

The police arrested Martin later that day at his home, where he was found with the three children, Dominic, Carlos, and Allister.  Martin was indicted on four counts of murder, four counts of attempted murder, four counts of rape, and one count each of aggravated burglary and aggravated robbery.  During the trial, the court dismissed one count each of murder and

attempted murder and the aggravated burglary charge.  The jury convicted Martin of the remaining eleven counts, as well as five firearm specifications.

After the three remaining murder counts and the three remaining attempted murder counts were merged into one count of each, Martin was sentenced to life for aggravated murder, ten years for attempted murder, ten years for aggravated robbery, ten years each for the four rape counts, two consecutively and two concurrently.  Aside from what was specified for the rape counts, all sentences were to be served consecutively, including the five firearm specifications.  The total sentence amounted to life plus fifty-five years.

(Doc. #5, Exhibit 4 at 116-121; *State of Ohio v. Charles Martin*, 2001 WL 1658140 at *1-*3

(Ohio Ct. App. Dec. 28, 2001).[3]

## III.  **Applicable Standard**

United States District Courts have the authority to grant a writ of habeas corpus to a

prisoner who is state custody "in violation of the Constitution . . . of the United States."  28

U.S.C.  §2241(a), (c)(3).  "The writ of habeas corpus plays a vital role in protecting

constitutional rights."  *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595 (2000).  "[T]he

essence of habeas corpus is an attack by a person in custody upon the legality of that custody,

and ... the traditional function of the writ is to secure release from illegal custody."  *Preiser*

*v. Rodriguez*, 411 U.S. 475, 484, 93 S.Ct. 1827, 1833 (1973).

In the modern era (post-April 1996) of habeas corpus litigation, the Antiterrorism and

---

[3]  Respondent's Exhibit 5 is missing page 5 of the Ohio Court of Appeals' decision.  The full decision is available on Westlaw.

Effective Death Penalty Act (AEDPA)[4] limits the reach of the writ of habeas corpus "'with respect to claims adjudicated on the merits in state court.'"  *Coomer v. Yukins*, 533 F.3d 477, 484 (6th Cir. 2008)(quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495 (2000)). A writ of habeas corpus issues under the AEDPA "only if the state court's decision was (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) ... based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Washington v. Renico*, 455 F.3d 722, 728 (6th Cir. 2006) (quoting, in part, 28 U.S.C. §2254(d)).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts.  Conversely, [u]nder the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  A state court need not cite Supreme Court cases on point or even be aware of such cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.

*Coomer*, 533 F.3d at 484 (quoting *Williams*, 529 U.S. at 412-13) (other citation and quotation marks omitted)(brackets in *Coomer*).  "'[A] federal habeas court may not issue a writ under the unreasonable application clause simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established Federal law

---

[4]  Codified in part in 28 U.S.C. §2254.  *See* Pub.L. No. 104-132, 110 Stat. 1214.

erroneously or incorrectly.'" *Lovell v. Duffey*, 629 F.3d 587, 594 (6th Cir. 2011)(quoting

*Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (quoting *Bell v. Cone*, 535 U.S. 685,

694, 122 S.Ct. 1843 (2002)). "Rather, the issue is whether the state court's application of

clearly established federal law is 'objectively unreasonable.'" *Lovell*,  629 F.3d at 594

(quoting *Miller v. Francis*, 269 F.3d 609, 614 (6th Cir. 2001)(quoting *Williams*, 529 U.S. at

410, 120 S.Ct. 1495))(other citation omitted).


## IV.   **Martin's First Claim**

Martin asserts the following in his first ground for relief:

> The evidence in this case was insufficient as a matter of law to support
> convictions of aggravated murder, attempted aggravated murder, aggravated robbery,
> and rape, resulting in the violation of the Petitioner's rights as protected by the
> Fourteenth Amendment to the United States Constitution.

(Doc. #1 at 29)(footnote omitted).

When courts examine a sufficiency of the evidence claim, the primary issue is if any

reasonable trier of fact could have found the essential elements of crime beyond a reasonable

doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979).  Mere existence

of new evidence relevant to the guilt or innocence of a prisoner is not enough for relief on

federal habeas corpus.  *Herrera v. Collins*, 506 U.S. 390, 398, 113 S.Ct. 853, 859 (1993).

When examining an insufficiency of the evidence claim, the issue is not "whether the trier

of fact made the *correct* guilt or innocence determination, but whether it made a *rational*

decision to convict or acquit." *Id.* at 402.

Evidence presented in a sufficiency of evidence claim must be viewed in a light most

7

favorable to the prosecution. *Jackson*, 443 U.S. at 319. Appellate courts should not consider sufficiency of evidence claims the same way trial courts consider evidence because "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera*, 506 U.S. at 399. When considering a sufficiency of the evidence claim, courts will not weigh the probative value of the evidence unless the defendant can show there was "fundamental miscarriage of justice" and there is new evidence of actual innocence. *Id.* at 404.

The AEDPA requires the federal court show deference to state court decisions unless the state court clearly misapplied Federal law or the decision was unreasonable. 28 U.S.C. §2254(d). "If there are conflicts in evidence or conflicting inferences arising from the facts, the court must presume that the trier of fact resolved those conflicts in favor of the state, and defer to that decision." *OB'Saint v. Warden*, 675 F.Supp.2d 827, 829 (S.D. Ohio 2009) (citing *Jackson*, 443 U.S. at 326).

Martin has *not* shown the evidence presented against him at trial was insufficient to support his convictions. The testimony of Anitra Jackson identified Martin as the perpetrator of the crimes and described Martin's actions in detail. The Ohio Court of Appeals' reliance on Anitra Jackson's testimony as sufficient evidence to support his convictions was consistent with *Jackson v. Virginia* and was not contrary and did not involve an unreasonable application of federal law as determined by the Supreme Court. This is readily seen in the Ohio Court of Appeals' discussion of Anitra Jackson's testimony:

Martin argues that there were several inconsistencies in the evidence,

8

> primarily in Anitra's testimony. While it may be true that there were minor inconsistencies, Anitra's testimony established every element of every crime Martin was convicted of, except from the aggravated murder charges regarding Jeanette. Although Anitra did not actually witness Martin shooting Jeanette, she did see him pick up the pillow and throw her on the bed. Anitra overheard her sister begging him not to "do it." Then second after climbing out the window and running from the house, Anitra saw Martin chasing her and shooting at her. A very short time later Jeanette's body was found with the blue pillow over her face. Furthermore, the firearms expert testified that all of the spent casings found at the scene, including the bullet that killed Jeanette and others that had been fired at Anitra, were fired from the same gun. Viewing this evidence in a light most favorable to the prosecution, we find that it was sufficient to support all of Martin's convictions.

(Doc. #5, Exh. 4 at 122-23). In addition, two other witnesses, Mr. Davis and Ms. Muhammed, identified Martin and described in detail his actions on Salem Avenue. Mr. Davis detailed Martin's shooting and attempting to repeatedly shoot Anitra as she lay helpless on Salem Avenue. Ms. Muhammed told the jury that she was screaming when Martin shot Anitra and that Martin looked at her and raised the gun but it did not fire because it jammed. Viewing Anitra Jackson's testimony as well as the testimony of Mr. Davis, Ms. Muhammed, and the firearm expert in the prosecution's favor leaves no doubt that sufficient evidence supported each of Martin's conviction and that the Ohio Court of Appeals' decision was not contrary to and involved a reasonable application of federal law as determined by the Supreme Court.

Accordingly, Martin's first claim provides no basis for granting federal habeas relief.

## V.    Martin's Second Claim

### A.    The Parties' Main Contentions

9

Martin maintains in his second ground for relief:

> The trial court erred to the prejudice of the Petitioner when it sentenced him to multiple terms for multiple firearm specifications, where the felonies underlying the specifications were part of the same "act or transaction."

(Doc. #1 at 35)(footnote omitted).

Respondent contends that Martin's second claim is barred because he never fairly presented it to the Ohio courts as a federal constitutional claim. Respondent points out that Martin relied on Ohio Rev. Code §2929.71 in support of his second claim, and he did not suggest that his sentence in any way offended the Constitution. Respondent further argues, "Although Martin referred to the federal constitution in the Ohio Supreme Court, his argument was based solely on Ohio law." (Doc. #5 at 69).

Respondent also contends that the trial court did not err by sentencing Martin to multiple sentences for multiple firearm specifications.

## B.    <u>Procedural Default – Fair Presentation</u>

### 1.

"A petitioner for a writ of habeas corpus must meet certain procedural requirements to permit review of his habeas claims by a federal court. The petitioner must first exhaust the remedies available in state court by fairly presenting his federal claims to the state courts; unexhausted claims will not be reviewed by the federal court." *Smith v. State of Ohio Dept. of Rehabilitation and Corrections*, 463 F.3d 426, 430-31 (6th Cir. 2006)(citing *Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004) (other citation omitted). "When the petitioner has failed to present the grounds to the state courts and has exhausted his claims because no state

remedy remains available, his grounds are procedurally defaulted." *Landrum v. Mitchell*, 625 F.3d 905, 918 (6th Cir. 2010)(citations omitted).

To fairly present a federal constitutional claim to the state courts, "[i]t is sufficient if 'the substance of a federal habeas corpus claim' [is] presented to the state courts, and there are instances in which 'the ultimate question for disposition' will be the same despite variations in the legal theory or factual allegations urged in its support." *Whiting v. Burt*, 395 F.3d 602, 612-13 (6th Cir. 2005)(quoting in part *Picard v. Connor*, 404 U.S. 270, 277-78, 92 S.Ct. 509 (1971)).  A petitioner can take four actions that are significant to resolving whether he has fairly presented the state courts with his federal claim:

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*Burt*, 395 F.3d at 613 (quoting in part *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)) (other citation omitted).

"[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004).

## 2.

Martin contends that the Ohio Court of Appeals' decision on September 2, 2005 "is

11

contrary to clearly established Federal law, as determined by the Supreme Court of the United States in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180... (1932); Bell v. United States, 349 U.S. 81, 75 S.Ct. 620... (1955); Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280... (1958); and North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072 (1969)." (Doc. #1 at 37).  Martin reasons:

> [H]is claim in the state courts that the trial court erred in sentencing him to "multiple terms" for "multiple firearm specifications" is tantamount to a violation of the Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth [Amendment], which provides that no person shall "be subject for the same offense to be twice put in jeopardy of his life or limb." *See North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).

(Doc. #8 at 524-25).

Martin contends that he first presented his claim during the appeal that led to the Ohio Court of Appeals' decision on September 2, 2005.  (Doc. #1 at 36-37).  During that appeal, Martin (through counsel) raised the following pertinent assignment of error:

> The trial court erred to the prejudice of the appellant when it sentenced him to multiple terms for multiple firearm specifications, where the felonies underlying the specifications were part of the "same act or transaction."

(Doc. #5, Exh. 31A at 370) (capitalization and underline omitted).  But, Martin based this assignment of error on state statutory law, Ohio Rev. Code §2929.71(B), rather than basing it on a violation of any provision of the U.S. Constitution.  (Doc. #5, Exh. 31A at 370-71). Martin likewise did not cite any of the U.S. Supreme Court cases he now relies on in the present case and did not cite any federal case at all, let alone one involving a constitutional issue.  Martin did not phrase his contentions in terms of federal constitutional law or in any

12

terms asserting a violation of a specific constitutional right, and he did not allege facts well within the mainstream of federal constitutional law.  *See id.*  Lastly, although Martin relied on several Ohio cases, review of those cases does not locate a federal constitutional claim or analysis.  *See State v. Gregory*, 90 Ohio App.3d 124, 129-30 (1993); *State v. White*, 71 Ohio App.3d 550, 553 (1991); *State v. Moore*, 20 Ohio App.3d 75, 76 (1984); *State v. Florence*, 1992 WL 68246, 1992 Ohio App. LEXIS 2076 (2nd Dist., Montgomery Cnty.).

Accordingly, Martin did not fairly present the Ohio courts with his claim that his sentence violated his rights under the Double Jeopardy Clause of the Fifth and Fourteenth Amendments by imposing multiple terms of imprisonment for multiple firearm specifications.

Because Martin does not have any remaining potential avenue of relief in the Ohio courts to raise his double jeopardy claim, to obtain federal habeas review he must show:  (1) cause for and prejudice from his procedural default; or (2) a fundamental miscarriage of justice will result from the denial of federal habeas review on the merits of this claim.  *See Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546 (1991); *see also Clark v. Waller*, 490 F.3d 551, 556 (6th Cir. 2007).  Martin does not present any fact or circumstance indicating the existence of cause for his failure to fairly present his double jeopardy claim to the Ohio courts.  *See* Doc. 1 at 35-39; Doc. #8 at 523-25. He does not, moreover, demonstrated that any prejudice results from his procedural default.  *See id.*  And he presents no circumstance indicating that a miscarriage of justice will occur from the denial of federal habeas review on the merits of this claim.

13

Accordingly, Martin's procedural default bars federal habeas review of his second ground for relief under 28 U.S.C. §2254(d).

### C.    **Merits Review**

Assuming, alternatively, that Martin fairly presented the Ohio courts with his double jeopardy claim, his claim lacks merit.

In *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182 (1932), the Supreme Court described the double-jeopardy analysis as follows:

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not....  "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."

284 U.S. at 304, 52 S.Ct. at 182 (internal citations omitted).  This rule, however, is inapplicable when a legislature intended to authorize multiple punishments for the same offense.  "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."  *Missouri v. Hunter*, 459 U.S. 359, 365 (1983). "Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authority by imposing multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221 (1977).

14

The Ohio Supreme Court has interpreted Ohio's sentencing statutes to permit separate punishments for each separate criminal transaction committed with the assistance of a firearm. *State v. Wills*, 69 Ohio St.3d 690, 691 (1994); *see also Carter v. Carter*, 59 Fed. Appx. 104 (6th Cir. Ohio 2003). The Ohio Supreme Court also defines "transaction" as "a series of continuous acts bound together by time, space and purpose, and directed toward a single objective." *Wills*, 60 Ohio St.3d at 691.

When denying his claim, the Ohio Court of Appeals examined Martin's convictions to determine whether they were separate criminal transactions and found:

> [Ohio] R.C. 2929.71(B) provides that "if any of the [underlying] felonies were committed as part of the same act or transaction, only one three-year term of actual incarceration shall be imposed for those offenses, which three-year term shall be served consecutively with, and prior to, the life sentences or indefinite terms of imprisonment." "The word 'transaction' contemplates a series of criminal offenses which develop from a single 'criminal adventure,' which have a logical relationship and which are committed within a continuous time sequence." *State v. Gregory* (1993), 90 Ohio App. 3d 124, 129, 628 N.E.2d 86. A transaction is "a series of continuous acts bound together by time, space and purpose. The word includes any number of offenses so long as the offenses have a logical relationship and are committed within a continuous time sequence." *State v. Florence* (April 8, 1992), Montgomery App. No. 12731, 1992 Ohio App. LEXIS 2076, unreported.
>
> While [Martin's] acts occurred within the same general time sequence, they were not bound together by space and purpose. Appellant shot Jeanette in the bedroom, while he inflicted most of Anitra's wounds outside of the house. Jeanette was the mother of his child, and he shot her because he believed she had been with other men. He raped each of them with an objective distinct from his intention to kill them; he wanted to have something to remember in prison. He robbed them to mislead the police as to the motive of their attacker. Because the events of April 26, 2000 constitute five separate transactions, namely the aggravated murder of Jeanette Jackson, the attempted aggravated murder of Anitra Jackson, the rape of Jeanette Jackson, the rape of

15

> Anitra Jackson, and the aggravated robbery of the women, the trial court properly imposed five consecutive terms for the firearm specifications.

(Doc. #5, Exh. 32 at 391-92). The Ohio Court of Appeals thus effectively determined that the Ohio legislature precluded the imposition of consecutive sentences felonies when the underlying felonies "were committed as part of the same act or transaction." The Ohio Court of Appeals then carefully considered whether Martin's underlying felonies met this same act or transaction. In this manner, the Ohio Court of Appeals' decision was consistent with, not contrary to federal constitutional law, and did not involve an unreasonable application of federal constitutional law as determined by the U.S. Supreme Court. *See Hunter*, 459 U.S. at 368-69 (Once the "legislature specifically authorizes cumulative punishment under two statutes ... a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishments under such statutes in a single trial."); *cf. White v. Howes*, 586 F.3d 1025, 1033 (6th Cir. 2009)("The current [Supreme Court] jurisprudence allows for multiple punishment for the same offense provided that the legislature has clearly indicated that its intent is to so provide, and recognizes no exception for necessarily included, or overlapping offenses.").

Accordingly, Martin's second ground provides no basis for granting habeas relief under 28 U.S.C. §2254(d).

## VI. **Martin's Third Claim**

### A. **Martin's Main Contentions**

Martin contends in this third ground for relief:

16

The inadequate representation that Petitioner received at trial and on appeal fell below an objective reasonable standard, thus, violating his rights to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution.

> A. Trial counsel was ineffective in his assistance through his failure to thoroughly pursue and present an alibi defense.

> B. Trial counsel was ineffective in his assistance through his failure to request [a] jury instruction on lesser included offense of voluntary manslaughter where evidence proffered by [the] State's key witness merited such instruction.

(Doc. #1 at 40, 43)(footnote omitted).

Respondent contends that Martin's alibi-related claim of ineffective trial assistance of counsel lacks merit because the Ohio Court of Appeals' decision was consistent with *Strickland v. Washington*, 466 U.S. 668 (1984).

### B. <u>Ineffective Assistance of Counsel</u>

### 1.

To establish constitutionally ineffective assistance of counsel (IAC), a criminal defendant must show that his trial counsel's acts, errors, or omissions fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 687-88, 104 S.Ct. at 2064. This demanding standard requires the defendant to establish that (1) defense counsel provided deficient performance and (2) the deficient performance prejudiced the defense so as to render his trial fundamentally unfair and the result unreliable. *Id.*

The first *Strickland* prong mandates a highly deferential review of trial counsel's

17

performance. *Id*. at 689, 104 S.Ct. at 2065. "[A] court must engage in the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id*. When trial counsel's acts or omissions constituted trial strategy, his or her performance was not constitutionally deficient. *Id*.

The second *Strickland* prong requires that trial counsel's "errors were so serious as to deprive ... [him] of a fair trial, a trial whose result is reliable." *Broom v. Mitchell*, 441 F.3d 392, 408 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2052).

Because the AEDPA precludes a *de novo* review of constitutional claims, *see Price v. Vincent*, 538 U.S. 634, 639, 123 S.Ct. 1848, 1852 (2003), a federal habeas petitioner carries a heavy burden when attempting to establish an IAC claim. "The Supreme Court has made clear that post-AEDPA claims of ineffective assistance of counsel brought by habeas petitioners will succeed only in very limited circumstances.... For [the petitioner] to succeed..., he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under §2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the ... [state] Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Payne v. Bell*, 418 F.3d 644, 665 (6th Cir. 2005).

**2.**

The Ohio Court of Appeals' decision cited *Strickland* and correctly described *Strickland*'s standards. (Doc. #5, Exh. 15 at 233-24). Its decision was therefore not contrary

to clearly established federal law.  The inquiry thus turns to whether the Ohio Court of Appeals unreasonably applied *Strickland* to Martin's contention that his trial counsel provided ineffective assistance by failing to thoroughly pursue and present an alibi defense at trial.

The Ohio Court of Appeals rejected Martin's IAC claim as follows:

> The trial court concluded that the affidavits Defendant submitted in support of his petition from the three potential alibi witnesses were not credible.  The court also concluded that the affidavit of Stanley Straight had no probative value regarding the commission of these crimes or the identity of the perpetrator.  We conclude that the trial court did not abuse its discretion in making those determinations.

> The affidavits were not completed until nearly two and one-half years after Defendant was convicted, and then all four were completed within thirty-three days.  Failure to promptly come forward with information that might have exonerated Defendant by showing he was elsewhere when the crimes occurred casts doubt upon the proposition that these affiants were available and willing to exonerate Defendant at the time of his trial.

> Furthermore, the record of the trial proceedings belies the notion that defense counsel were apathetic about tracking down and interviewing potential witnesses that might prove helpful to the defense.  When Defendant told his attorneys during the State's case-in-chief about a potentially helpful witness, Anthony Snowden, who could contradict some of the victim's testimony, defense counsel went out of their way to locate and speak with that witness, although counsel ultimately decided not to call Snowden.  This demonstrates defense counsel's willingness to seize any opportunity to investigate potentially favorable testimony, which stands in stark contrast to Defendant's allegation that these same defense counsel ignored potentially helpful alibi witnesses.  The trial record refutes the notion that defense counsel would ignore and fail to interview alibi witnesses who could potentially exonerate Defendant.  In that regard, the trial court observed that neither of Defendant's trial counsel are now available: lead counsel passed away in 2002, and co-counsel no longer practices law in this area.

> The trial court further noted that the language used in the affidavits is

19

very similar and in some cases identical.  Also, the affidavit of Charles Red is internally inconsistent as to the date it was prepared and "sworn and subscribed."  Finally, the trial court noted that during a prior proceeding in this case another prospective witness, Darron Finch, provided an affidavit stating that he witnessed the shooting on Salem Avenue and that Defendant was not the perpetrator.  A subsequent hearing revealed that Finch and Defendant's brother had been incarcerated together at Dayton Correctional Institute (DCI) and Finch had secured and read trial material that he obtained from Defendant's brother, including the testimony of witnesses describing the shooting.  Accordingly, Finch's affidavit was discredited as being contrived. Similarly, one of the present affiants, Antonio Haney, was also incarcerated at DCI at the same time as Defendant's brother and Darron Finch.

With respect to the affidavit of Stanley Straight, in which he avers that one of the victims in this case argued with an unidentified man at a nightclub the night before these crimes occurred, the trial court concluded that this affidavit, even if true, was not probative of any facts material to the events that occurred on the morning of the shootings.  In other words, this affidavit has no probative value.

Because the trial court properly found in the exercise of its discretion that the affidavits of the potential alibi witnesses were not credible, Defendant has failed to meet his burden to produce evidentiary documents that demonstrate a genuine issue as to whether defense counsel performed deficiently and rendered ineffective assistance by failing to call those alibi witnesses at trial.  Thus, the trial court did not err in summarily dismissing Defendant's petition without a hearing.

Even assuming for the sake of argument that the affidavits were credible and defense counsel was aware of the alibi witnesses and chose not to present their testimony at trial, that fact alone is not sufficient to demonstrate ineffective assistance of counsel.  Generally, counsel's decision whether to call a particular witness falls within the rubric of trial strategy, and will not be second guessed by a reviewing court.  *State v. Williams*, 99 Ohio St.3d 493, 2003 Ohio 4396, 794 N.E.2d 27; *Brown*, supra.  Even debatable trial tactics and strategies do not constitute ineffective assistance of counsel. *State v. Clayton* (1980), 62 Ohio St.2d 45, 402 N.E.2d 1189.  Defense counsel may have employed a reasonable trial strategy in this case by choosing not to call these potential alibi witnesses if, for example, counsel determined that the witnesses lacked credibility and would not assist the defense. *Brown*, supra; *State v. Dawson* (July 30, 1997), Summit App. No. 18216, 1997 Ohio App.

LEXIS 3464; *State v. Allen* (Jan. 22, 1998), Cuyahoga App. No. 72231, 1998 Ohio App. LEXIS 193.  Indeed, unreliable witnesses can harm a defendant who offers their testimony in evidence.

The proposed testimony of the three potential alibi witnesses that they saw Defendant outside his home around the time these crimes occurred was contradicted by both the victim who survived the attack and positively identified Defendant as the perpetrator, and by a motorist/bystander who witnessed the shooting on Salem Avenue and also identified Defendant as the attacker.  Given that fact and the questionable credibility of the alibi witnesses, which we previously discussed, defense counsel, after weighing the costs and benefits of the potential alibi testimony, may reasonably have made a strategic decision not to call these witnesses because they were not credible.

Defendant has failed to demonstrate substantive grounds for relief with respect to his ineffective assistance of trial counsel claim.  Viewing the evidence in a light most favorable to Defendant, reasonable minds can only conclude that Defendant failed to demonstrate a genuine issue as to whether defense counsel's performance was deficient and fell below an objective standard of reasonableness, much less a reasonable probability of a different outcome but for counsel's alleged errors.  The trial court did not err in rendering summary judgment in favor of the State and dismissing Defendant's post-conviction petition without a hearing.

(Doc. #5, Exh. 15 at 233-38).  For these reasons detailed in the above discussion by the Ohio Court of Appeals, its conclusion that Martin's ineffective assistance of counsel claim lacks merit was both correct and did not involve an objectively unreasonable application of *Strickland*.  There is no need to repeat those reasons except to emphasize that the absence from trial of the alibi witnesses did not deprive Martin of a trial whose result is reliable.  *See Broom*, 441 F.3d at 408.  This is so in light of the identification of Martin as the perpetrator by three eye witnesses who testified at trial:  Anitra Jackson, who knew Martin before the incident and who personally observed him from near-fatally close distances over almost the entire course of the events; Mr. Davis, who detailed

21

Martin's actions in shooting and attempting to repeatedly shoot Anitra as she lay helpless on Salem Avenue; and Ms. Muhammed, who also saw Martin shoot Anitra Jackson on Salem Avenue and who got a close look at Martin when he stood in front of her vehicle and attempted to fire the gun at her without success (because the gun jammed). Given the certainty and consistency of this identification testimony, the absence of the purported alibi testimony does little, if anything, to undermine the reliability of the jury's conclusion that Martin committed the crimes at issue.

Accordingly, defense counsel's failure to pursue and present an alibi defense did not constitute constitutionally ineffective assistance and provides no basis for granting habeas relief under 28 U.S.C. §2254(d).

### C.    Procedural Default

Martin also claims that defense counsel provided constitutionally ineffective assistance by failing to request a jury instruction on the lesser included offense of voluntary manslaughter.

Respondent contends that Martin committed a procedural default by not raising this ineffective assistance of counsel claim on his direct appeal. This contention is well taken.

To obtain federal habeas review, the record must show that Martin properly raised his federal constitutional claims in the Ohio courts pursuant to Ohio's adequate and independent procedural rules. *See Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004);

22

*see also Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing, in part, *Coleman v. Thompson*, 501 U.S. 722, 749, 111 S.Ct. 2546 (1991)); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  If Martin did not follow Ohio's adequate and independent rules of procedure and the Ohio courts enforced those rules against him, then his procedural default might result in a waiver of one or more of his claims for purposes of federal habeas review.  *See Bonilla*, 370 F.3d at 497; *see also Buell*, 274 F.3d at 349.

Four questions are considered when resolving whether a specific state procedure rule bars federal habeas review:

1.   Whether there is a firmly established Ohio procedural rule with which the petitioner failed to comply;

2.   Whether the Ohio court actually enforced the rule in sanctioning the petitioner's failure to comply;

3.   Whether the petitioner's failure to comply with the state procedural rule constitutes an adequate and independent ground for barring federal habeas review; and

4.   Whether cause exists to dispense with the procedural rule and whether the petitioner was actually prejudiced by the alleged constitutional error or whether a failure to conduct habeas review of a claim will result in a miscarriage of justice.

*See Deitz v. Money*, 391 F.3d 804, 808-09 (6th Cir. 2004)(and cases cited therein).

Recalling that Martin's remaining IAC claim is based on defense counsel's failure to request a jury instruction on voluntary manslaughter, Martin first raised this claim on his delayed appeal in the Ohio Court of Appeals after his case had been remanded for re-sentencing.  The Ohio Court of Appeals concluded that the doctrine of res judicata barred

this claim because Martin should have raised it on his direct appeal.  (Doc. #5, Exh. 32 at 393).  The Ohio Court of Appeals explained, "'Where an argument could have been raised on initial appeal, res judicata dictates that it is inappropriate to consider that same argument on a second appeal following remand.'" *Id.* (quoting *State v. Hutton* (2003), 100 Ohio St.3d 176, 182).  It is well-settled that res judicata is firmly established in Ohio criminal cases and that the Ohio court's application of "*res judicata* is an adequate and independent state ground for barring habeas review of constitutional claims."  *Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004) (and cases cited therein).  The Ohio Court of Appeals actually enforced res judicata against Martin.  (Doc. #5, Exh. 32 at 393).  The record contains no basis for concluding that cause existed to excuse Martin's omission of this claim on direct appeal, that prejudice actually results from the alleged IAC, or that omission of this claim from federal habeas review works a fundamental miscarriage of justice upon Martin.

In his third ground for relief Martin claims he received inadequate representation on appeal but is otherwise silent as to the particulars. A claim of ineffective assistance of appellate is also procedurally defaulted as set forth above. Moreover, presuming Martin claims appellate counsel was ineffective for failing to raise the alleged ineffective assistance of trial counsel, the claim lacks merit since trial counsel did not render ineffective assistance.

Accordingly, Martin's procedural default bars federal habeas review of this claim.

## VII.    <u>Evidentiary Hearing</u>

Martin seeks an evidentiary hearing.  He contends that the denial of an evidentiary hearing will result in a fundamental miscarriage of justice.  His request for an evidentiary does not survive the Supreme Court's recent holding that "review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, __U.S.__, 131 S.Ct. 1388, 1398 (2011).  Indeed, "evidence introduced in federal court has no bearing on §2254(d)(1) review."  *Id*., __U.S. at __, 131 S.Ct. at 1400.  Martin's request for an evidentiary therefore lacks merit.

## VIII.   <u>Certificate of Appealability</u>

Before a petitioner may appeal a denial of his habeas petition, he must first obtain a certificate of appealability.  28 U.S.C. §2253(c)(1)(A).  To obtain a certificate of appealability when a habeas petition is denied on the merits, the petitioner must make a substantial showing of the denial of a constitutional right.  *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595 (2000).  This is accomplished by showing that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.  If the District Court dismisses the petition on procedural grounds without reaching the merits of the constitutional claims, the petitioner must show that jurists of reason would find it debatable whether the District Court is correct in its procedural ruling.  *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.

The conclusions reached in the instant Report are not debatable by jurists of reason and the case does not otherwise present issues adequate to deserve encouragement to Martin to proceed further. Consequently, a certificate of appealability should not issue in this case.

## IT IS THEREFORE RECOMMENDED THAT:

1. Charles Martin's Petition for Writ of Habeas Corpus (Doc. #1) be DENIED and DISMISSED;

2. Martin be denied leave to appeal *in forma pauperis* pursuant to 28 U.S.C. §1915(a) and be denied any requested certificate of appealability under 28 U.S.C. §2253(c); and,

3. The case be terminated on the docket of this Court.


April 19, 2011

     s/Sharon L. Ovington     
Sharon L. Ovington
United States Magistrate Judge

26

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).